**In re The CELOTEX CORPORATION, et al., Debtor.**

Bankruptcy Nos. 90–10016–8B1, 90–10017–8B1.

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Sept. 24, 1998.

854

Jeffrey W. Warren, Bush, Ross, Gardner, Warren & Rudy, P.A., Tampa, FL, for Debtor.

Charles P. Schropp, Schropp, Buell & Elligett, P.A., Tampa, FL, Leon B. Kellner, Dickstein, Shapiro, Morin & Oshinsky, L.L.P., Washington, DC, Kevin E. Irwin, Keating, Muething & Klekamp, P.L.L., Cincinnati, OH, for The Asbestos Settlement Trust.

George N. Wood, Vice President and General Counsel, Tampa, Fl, for Celotex Corp.

David S. Shrager, Shrager, McDaid, Loftus, Flum & Spivey, Philadelphia, PA, for Unknown Asbestos Bodily Injury Claimants.

James L. Patton, Young, Conaway, Stargatt & Taylor, Wilmington, DE, for Legal Representative for Unknown Asbestos Bodily Injury Claimants.

Steven M. Berman, Morse, Berman & Gomez, P.A., Tampa, FL, Debt Aquisition Co. of America, II & IV, L.P.

Samuel Braver, Deborah Little, Tampa, FL, for Newstart Factors, Inc.

Sara Kistler, Assistant United States Trustee, Tampa, FL.

1. *In re Celotex Corp.*, 204 B.R. 586 (Bankr. M.D.Fla.1996) (confirmation order).

2. Specifically, Newstart concedes ownership vested in DACA upon DACA's earlier purchase of the following: New York Susquehanna & Western Railway—Original Claim No. 3003; OTEC—

## ORDER ON (1) MOTION TO DETERMINE OWNERSHIP OF CERTAIN TRANSFERRED CLAIMS BY DACA and (2) MOTION TO EXCLUDE AFFIDAVITS FILED IN CONNECTION WITH MOTION TO DETERMINE OWNERSHIP OF CERTAIN TRANSFERRED CLAIMS

THOMAS E. BAYNES, Jr., Bankruptcy Judge.

THIS CAUSE came on for a hearing on the Motion to Determine Ownership of Certain Transferred Claims filed by Debt Acquisition Company of America II, L.P. and Debt Acquisition Company of America IV, L.P. (DACA) in this confirmed Chapter 11 case.[1] The Court allowed memoranda of law to be filed and in addition, Newstart Factors, Inc. (Newstart) filed several affidavits. In response to those Affidavits, DACA filed a Motion to Exclude Affidavits Filed in Connection with Motion to Determine Ownership of Certain Transferred Claims (Motion to Exclude) on the basis the parties agreed no evidence need be adduced since the matter was simply a question of law.

This matter involves the purchase of the same claims by two separate and unrelated entities, DACA, and Newstart. The claims were purchased from some trade creditors by DACA and Newstart on different dates. Newstart contends it owns the claims because it first purchased the claims for value. DACA, on the other hand, argues it is the rightful owner of the claims by virtue of its earlier filing of the claims' assignments in the Claims Register of this case pursuant to Fed.R.Bankr.P. 3001(e). Notwithstanding DACA's initial request that the Court determine ownership of a number of claims, Newstart has since conceded it does not own certain of those claims; therefore, only the following three claims are actually at issue: (1) Johnstown Communications—Claim No. S435419; (2) Packard's—Claim No. S585450; and (3) Redwing Carrier, Inc.—Claim No. 3239.[2]

Original Claim No. 3709; Silver Arrow Inc.—Original Claim No. S696350; and W.M. Johnson Truck Line—Original Claim No. S434107. *See* Answer of Newstart Factors, Inc. to Motion of Debt Acquisition Company of America II and Debt Acquisition Company of America IV, L.P. to

It is undisputed Newstart purchased the claims from the original trade creditors in April, 1995, and filed the assignments on November 15, 1995. It is also undisputed that DACA ostensibly purchased the same claims from the same trade creditors afterwards but, in each instance, filed its assignments before Newstart.[3] No other facts are necessary or relevant to the determination of an assignee's rights in these claims as a matter of bankruptcy and federal law.

Although there exists the presumption a properly filed proof of claim is prima facie evidence of the validity and the amount of the claim, the validity of a claim is subject to the objection of the Debtor or a "party in interest." 11 U.S.C. § 502(a); Fed. R.Bankr.P. 3001(f); e.g., In re Bertelt, 184 B.R. 603 (Bankr.M.D.Fla.1995); In re Automotive Armature Co., Inc., 219 B.R. 513 (S.D.Ind.1998); In re Zaleha, 162 B.R. 309 (Bankr.D.Idaho 1993). Thus, if two claims were filed and the Debtor or any other party in interest did not object to either, both would be allowed. In this confirmed case, however, the issue is not the validity of the debt, but rather which of the competing transferees has the vested right to the subject claims.[4] The Debtor urges this Court to resolve the issue of which creditor it should pay.

■ Federal Rule of Bankruptcy Procedure 3001 governs proofs of claims, subsection (e) of which addresses transferred claims. In situations such as this, where the transferor files a proof of claim prior to the transfer, Rule 3001(e)(2) provides the method through which the transferee may be substituted for the transferor.[5] The Committee Note to the Rule indicates:

> [T]he interests of sound administration are served by requiring the post-petition transferee to file with the proof of claim a statement of the transferor acknowledging the transfer and the consideration for the transfer. Such a disclosure will assist the court in dealing with evils that may arise out of post-bankruptcy traffic in claims against an estate.

(citations omitted). However, the Rule was amended in 1991 specifically to:

> limit the court's role to the adjudication of disputes regarding transfer of claims.... [The] Rule is not intended either to encourage or discourage post-

---

Determine Ownership of Certain Transferred Claims.

However, Newstart's concession it does not own these claims is not axiomatic of the conclusion that DACA does. This Order is not meant to be construed as a ruling on the ownership of any but the three claims squarely at issue. This is so particularly since two of those claims (OTEC and Johnstown Communications Inc., in the amounts of $31,714.74 and $3,404.00, respectively) reflect an assignment was taken by a company which has not appeared in these proceedings, namely, Debt Acquisition Company of America III.

3. With regard to the Johnson Communications claim, Newstart purchased the claim on April 10, 1995, while DACA purchased the claim on September 6, 1995. Newstart did not file its assignment until November 15, 1995, while DACA filed its assignment on September 13, 1995, or within one week of its purported purchase. Likewise, Newstart purchased Packard's claim on April 7, 1995, while DACA's purchase did not occur until May 22, 1995. Newstart again delayed the filing of its assignment until November 15, 1995, while DACA filed its assignment on June 19, 1995. Lastly, as to the Redwing Carrier Inc. claim, Newstart's purchase was made on April 20, 1995, while DACA's purchase occurred on June 1, 1995. Newstart's assignment was filed on November 15, 1995, whereas DACA filed its assignment on June 8, 1995.

4. There is nothing in this record to suggest either party engaged in inequitable conduct or acted in bad faith when purchasing the claim, such as for purposes of harassing the Debtor or controlling or obstructing the confirmation process under 11 U.S.C. §§ 1126, 1129. Accord, In re Figter, Ltd., 118 F.3d 635 (9th Cir.1997); Troy Sav. Bank v. Travelers Motor Inn, Inc., 215 B.R. 485 (N.D.N.Y. 1997); Zaleha, supra at 315; but compare, In re Rook Broadcasting of Idaho, Inc., 154 B.R. 970 (Bankr.D.Idaho 1993); see generally, Coleman, Purchasing Claims to Control a Vote: The Difference Between Self–Interest and Ulterior Motives, 115 Banking L.J. 160 February 1988); Gutcho and Fidler, Purchasing Claims to Block Bankruptcy "Cramdown" Plans: A New Weapon for Creditors, 115 Banking L.J. 4 (January, 1998); Haines, Bought Claims Stay Bought, 9 Norton Bankr.L. Advisor 1 (September 1997).

5. That section, entitled "Transfer of Claim Other Than for Security After Proof Filed" provides in pertinent part:

> If a claim ... has been transferred other than for security after the proof of claim has been filed, evidence of the transfer shall be filed by the transferee.

petition transfers of claims or to affect any remedies otherwise available under nonbankruptcy law to a transferor or transferee such as for misrepresentation in connection with the transfer of a claim.

In that vein, application of the Rule has been limited to situations involving prejudice to the estate or a party in interest such that when none exists "there is no indication that failure to comply with Rule 3001(e), without more, affects the enforceability of an otherwise valid transfer." *In re Crosscreek Apartments, Ltd.*, 211 B.R. 641, 645–46 (Bankr.E.D.Tenn.1997). While it is clear the Rule is directed towards protecting the claim transferor, its ultimate effect is to insure the Debtor has notice of the proper claimant to pay.

Nor should the Claims Register, authorized pursuant to Bankruptcy Rule 5003(b), become an instrument through which a party in interest can establish priority or ownership between competing claims. To do so would constitute an improper use of the Claims Register as to create some form of race-notice priority systems or a grantor-grantee index. Otherwise, the bankruptcy setting would be ripe for creation of all forms of per se rules to deal with on a case-by-case basis. Indeed, local rules are confusing enough without ad hoc judicial ones. *E.g., In re Papercraft Corp.*, 211 B.R. 813, 822 (W.D.Pa.1997). Further, it is unequivocal the bankruptcy rules cannot "abridge, enlarge, or modify any substantive right of a party in interest" otherwise provided by law. 28 U.S.C.A. § 2075; *accord Arc Energy Corp.*, 1997 WL 570878 (4th Cir.1997) (unpublished decision).

In *Olson*, the Eighth Circuit Court of Appeals disagreed with the bankruptcy court's disallowance and subordination of certain claims transfers predicated upon contentions of abuse of the bankruptcy process.[6] The difference between previous Rule 3001(e) and the current Rule is the prior one arguably embodied the bankruptcy court's involvement with every claims transfer while the current Rule does no such thing.[7] *In re Olson*, 120 F.3d 98, 102 (8th Cir.1997).

Both prior to the Rule's amendment and presently, the trading of claims represents a familiar practice in bankruptcy both as a short-term investment vehicle and long-term with the intention of obtaining a strategic position in the confirmation process.[8] The circumstances of this case involve the former, a practice in which DACA frequently participates.[9] In many instances, claims trading

---

**6.** This Court declines to so broadly construe the Eighth Circuit's opinion in this circumstance, and rejects DACA's arguments concerning the applicability of two cases decided prior to the enactment of the 1991 amendments discussed herein; namely, *In re Wilson*, 96 B.R. 257 (9th Cir. BAP 1988) and *In re Oxford Mushroom Products, Inc.*, 93 B.R. 390 (Bankr.E.D.Pa.1988).

**7.** In interpreting the language of the current Rule, several circuits have subscribed to the following conclusion:

> The [bankruptcy] court's powers under this section are broad but not unlimited. "While the equitable powers emanating from § 105(a) are quite important in the general bankruptcy scheme, and while such powers may encourage courts to be innovative, and even original, these equitable powers are not a license for a court to disregard the clear language and meaning of the bankruptcy statutes and rules.

*Olson, supra* at 102 (quoting *Official Comm. of Equity Sec. Holders v. Mabey*, 832 F.2d 299, 302 (4th Cir.1987), *cert. denied*, 485 U.S. 962, 108 S.Ct. 1228, 99 L.Ed.2d 428 (1988)).

**8.** Those strategies have been described as follows:

> In the first case, an investor will purchase a claim at a discount (in many cases general unsecured claims are purchased at a deep discount). The concept is like playing the stock market. The assumption is that the plan of reorganization will provide a distribution that will exceed the purchase price of the claim after allowing for the time-value of money between the date of purchase and the date of distribution under the confirmed plan. This is a passive investment strategy.
>
> A more aggressive investor will acquire a significant portion of the debt to place themselves favorably in a strategic position to participate in the plan negotiation process, acquire a blocking position within a particular class or acquire control of the debtor.

Crudo, *Claims Trading: Managing the Confusion*, 14 Am. Bankr.Inst. J. 29 (Nov.1995); *see also* Case, *Trading in Claims*, Norton Annual Survey of Bankruptcy Law 45 (1998–1999).

**9.** Other companies, such as Amroc Investments, Bear Sterns and Smith Factors "turn a profit buying and selling the claims" of companies involved in Chapter 11 reorganization in a presently unregulated securities market. *Claims Trading, supra* note 8.

may positively contribute to the reorganization process, particularly where lenders' and trade creditors' faith in the debtor has diminished.[10]

■ In attempting to bolster its ownership claims, DACA urges the Court to apply Florida law adopting Article 9 of the Uniform Commercial Code as to priority of perfected and unperfected security interests. *E.g.,* §§ 679.102(b), 679.106, 679.312(5) & (6), and 679.318(3) Fla.Stat. (1995). However, the claims at issue appear to be contract rights and DACA has presented no evidence to demonstrate its purported claims are in the nature of security interests. *E.g., Major Electrical Supplies, Inc. v. J.W. Pettit Co.,* 427 F.Supp. 752 (M.D.Fla.1977); *Chamco v. Champion Map Corp.,* 263 So.2d 641 (4th Fla. DCA 1972); *see generally* Coogan, Hogan, Vagts, and McDonnell, *Secured Transactions Under the Uniform Commercial Code* Ch. 1, (Matthew Bender 1998). As to assignment of contract rights in Florida, no recording of the transfer is required for the assignment to be valid. *E.g., Pettit, supra* at 754. Absent any statutory mandate, the recording of an assignment (here, limited to inclusion in the Claims Register) is unnecessary to establish ownership or priority of the claims at issue. *See generally,* 6 Am.Jur.2d *Assignments* §§ 95, 102 (1963).

■ Even considering DACA's arguments in their most favorable light, the basic tenet of the law governing sales of personalty is "a seller cannot transfer better title to a chattel than it possesses." Brown, *The Law of Personal Property,* § 67 (2d 1955); *see also* Dunham, *Postpetition Transfers in Bankruptcy,* 39 U.Miami L.Rev. 1 (November 1984). Stating that general caveat emptor doctrine another way, one cannot take title from a seller who has no title, irrespective of the amount paid or how honest the purchase. *Postpetition Transfers, id.* at 130. Thus, the determination of ownership, or "title," in this sense is constricted by a simple principle of sales—the sale cannot realistically occur unless the seller has the power to alienate a valuable property right in an identifiable good.

This exemplifies the philosophy at common law that since recording a conveyance was not practiced, title as to competing claims obtained from the same transferor vested in the one who was prior in time. 66 Am.Jur.2d *Recording and Recording Laws* § 158 (1973). In *Judson v. Corcoran,* the United States Supreme Court offered the following explanation:

> [A]ssuming that both sets of assignments are alike fair, and originally stood on the same bona fide footing, the rule of necessity is, that the assignor having parted with his interest in the first assignment, the second assignee could take nothing; and, as he represents his assignor, is bound by the equities imposed on the latter; and hence has arisen the maxim in such cases, that he who is first in time is best in right.

58 U.S. 612, 613, 17 How. 612, 15 L.Ed. 231 (1854) (citations omitted); *see also, Litton Industrial Automation Systems, Inc. v. Nationwide Power Corp.,* 1995 WL 381838 (M.D.Fla.1995) (unpublished decision); Schroeder, *Death and Transfiguration: The Myth That the U.C.C. Killed "Property",* 69 Temp.L.Rev. 1281 (Winter 1996). Under the foregoing analysis, DACA, as the later assignee, cannot succeed in establishing its ownership of the claims because "it does not follow that mere priority of notice of [a] later assignee, who took nothing by has assignment, will subordinate the rights of an earlier assignee." *Salem Trust Co. v. Manufacturers' Finance Co.,* 264 U.S. 182, 193, 44 S.Ct. 266, 68 L.Ed. 628 (1924).

■ Absent a statutory requirement, the law is unequivocal that, as to the assignment of competing claims, the first in time is first in right. *See U.S. v. Kimbell Foods,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979); *Federal Deposit Ins. Corp. v. Jenkins,* 888 F.2d 1537 (11th Cir.1989). This Court is satisfied Newstart acquired the claims first and, therefore, Newstart is deemed to have all rights associated with the three claims at issue.

Accordingly, it is

---

**10.** *Claims Trading, supra* note 8.

ORDERED, ADJUDGED AND DE-CREED the Motion to Determine Ownership of Certain Transferred Claims by DACA be, and the same is hereby, granted and Newstart Factors, Inc. is deemed the owner of the following claims: (1) Johnstown Communications—Original Claim No. S435419; (2) Packard's—Original Claim No. S585450; and (3) Redwing Carrier, Inc.—Original Claim No. 3239. It is further

ORDERED, ADJUDGED AND DE-CREED DACA's Motion to Exclude Affidavits Filed in Connection with Motion to Determine Ownership of Certain Transferred Claims be and the same is hereby denied as moot.